IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL E. PROCTOR, JR.,                    )
          Plaintiff                       )        Civil Action No. 06-40 Erie
                           )        District Judge McLaughlin
      v.                                   )        Magistrate Judge Baxter
                           )
JO ANNE B. BARNHART,                      )
Commissioner of Social Security           )
          Defendant                       )


_____MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION_____


I.      RECOMMENDATION

      It is recommended that the Plaintiff's Motion for Summary Judgment be denied.  It is further recommended that the Motion for Summary Judgment filed by the Defendant be granted and the decision of the Commissioner denying Plaintiff's application for Supplemental Social Security Income be affirmed.


II     REPORT

      A.     Procedural Background

      Plaintiff Paul E. Proctor ("Proctor") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), as amended, 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security denying his Application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") which he protectively filed on February 7, 2002.[1]  His application was denied, and he requested a hearing.

_____
[1]

Proctor previously filed a claim for Disability Insurance Benefits on September 14, 2000, alleging disability since September 7, 2000, due to a seizure disorder, chronic bronchitis, and pneumonia. (R. 17).  After a hearing before Administrative Law Judge James J. Pileggi on , May 8, 2001, Proctor's claim was denied by ALJ Pileggi by decision dated September 26, 2001. (R. 59-68).  Proctor then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on February 20., 2002.  Proctor did not appeal that claim further and, under the doctrine of res judicata, the issue of Plaintiff's disability raised in such claim was finally and unfavorably determined through September 26, 2001.  Thus, although Proctor claims disability as of November 7, 2000, the relevant time period in this case began on September 27, 2001, the day after ALJ Owen's unfavorable decision.  See 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1).

A hearing was conducted before Administrative Law Judge R. Neely Owen on June 2, 2003, at which Proctor was represented by legal counsel. A vocational expert, Fred A. Monaco, PhD., testified at this hearing. ALJ Neely issued a decision on December 9, 2003, finding that Proctor was not disabled during the relevant time period and denying his claim for disability benefits. Proctor filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on January 17, 2004. The Appeals Council granted the request on July 6, 2004, vacated ALJ Neely's decision, and remanded the case for further consideration of whether Proctor's impairments satisfied a listing.

In the meantime, Plaintiff had filed a subsequent claim for DIB and SSI on April 14, 2004, which was merged with Plaintiff's existing claims upon remand. After remand, another hearing on Plaintiff's existing and merged claims was held on April 19, 2005, before Administrative Law Judge James J. Pileggi, at which Proctor was represented by legal counsel. A vocational expert, Charles Cohen, Ph.D., testified at this hearing. ALJ Pileggi issued a decision on September 14, 2005, finding that Proctor was not disabled during the relevant time period and denying his claim for disability benefits. Proctor filed a request for review of the ALJ's decision with the Appeals Council on November 15, 2005, which request was denied on January 19, 2006.

Proctor has filed this appeal seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). He alleges errors entitling him to an award of benefits, or in the alternative, a new administrative hearing. The Commissioner disagrees. Both Proctor and the Commissioner have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The matter is now ripe for review and disposition.

## B.    Factual Background

Proctor was born on August 23, 1961. (R. 54).[2] At the time of the most recent ALJ

---

[2]

The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g)of the Act, 42 U.S.C. § 405(g), which is referred to

hearing, Proctor was 43 years of age. (R. 617).  He has a 10th grade education attained in special education classes. (R. 17).  He has past relevant work experience as a laborer, a floor maintenance person, a drill press operator, and a yard worker. (R. 17).  Proctor testified that he is unable to work due to a seizure disorder, herniated discs, chronic shoulder girdle syndrome, headaches, and limited special education. (R. 17).

###   C.      Medical Background

        The ALJ found that Proctor had the following severe impairments: seizure disorder, disorders of the back (discogenic and degenerative), cervical pain, headaches, and borderline intellectual functioning (R. 18); however, Proctor has challenged only the ALJ's conclusions regarding the limitations arising from his back and neck impairments. (Document # 14, Plaintiff's Brief, at  pp. 10-17).  As a result, this Court will confine its review of the medical evidence to Proctor's back and neck impairments.

        According to the medical record, Proctor experienced the onset of cervical and right upper extremity symptoms in November 2000, following a seizure. (R. 287, 304).  Proctor's physical impairments have been treated primarily by Donald Rezek, M.D., a neurologist, and James Macielak, M.D., an orthopedist.

        In 2001, Proctor visited Dr. Rezek on six occasions. (R. 312-13, 315, 317-18, 320).  On January 18, 2001, Proctor visited Dr. Rezek, complaining that he was experiencing headaches. Upon examination, Proctor was found to be in no acute distress, with normal strength and reflexes. (R. 320).  Proctor returned to Dr. Rezek on February 15, 2001, complaining about having an upper respiratory tract infection.  He was again found to be in no acute distress. (R. 318).  Proctor next visited Dr. Rezek on May 18, 2001, at which time he first mentioned experiencing right shoulder pain associated with a seizure-related fall. (R. 317).  An x-ray of the shoulder was taken, which demonstrated no fracture or dislocation. (R. 309).  Proctor returned to Dr. Rezek on June 14, 2001, complaining of continued discomfort in his right shoulder;

---

hereinafter as "R."

3

however, the examination was unremarkable. (R. 315).

In  July 2001, Proctor began receiving treatment for his cervical and right shoulder pain at Dr. Macielak's office, initially under the care of Dr. Macielak's associate, Vincent J. Paczkoskie, Jr. , M.D.  Proctor's first visit with Dr. Paczkoskie occurred on July 16, 2001, during which Proctor reported experiencing a significant amount of pain in the trapezial area and stiffness in his neck. (R. 304).  Upon examination, it was noted that Proctor had "excellent motion of his shoulder and full forward elevation," and "excellent cuff strength" with "negative impingement testing." (Id.).  With respect to Proctor's cervical spine, it was noted that he had decreased motion, with some spasm and shooting pain in his trapezial area, bilaterally.  X-rays of Proctor's cervical spine were taken, which demonstrated some degenerative changes at C4-5 and C5-6 areas, with "no frank instability noted." (Id.).  Proctor was assessed with a cervical strain, and an MRI was recommended to evaluate for a disc herniation.

An MRI of Proctor's cervical spine was performed on July 21, 2001, which revealed disc herniations from C3-4 through C5-6. (R. 308).  Proctor followed up with Dr. Paczkoskie on August 7, 2001, who noted that the MRI indicated degenerative disc disease, as well as the documented disc herniations, with "no significant canal or foraminal compromise." (R. 302). Accordingly, Dr. Paczkoskie recommended a formal physical therapy program and anti-inflammatory medication. (Id.).

On September 6, 2001, Proctor returned to Dr. Rezek, who acknowledged the MRI results, but noted that the disc herniations were "small ... without clear cut impingement of the cord or significant foraminal stenosis."  Upon examination, Dr. Rezek indicated that reflex testing demonstrated decreased biceps and brachioradialis, and that head turning and movement were within normal limits, except for turning to the right, which exacerbated Proctor's symptoms. (R. 313).

Plaintiff had a follow-up visit with Dr. Paczkoskie on September 13, 2001, who noted that physical therapy was helping Proctor's "flank pain," but that he was continuing to experience "a significant amount of paraspinal and right trapezial pain." (R. 296).  As a result, it was recommended that Proctor be sent to the Pain Clinic, to be followed up by Dr. Macielak for

4

evaluation. (Id.).

Proctor was subsequently evaluated by Dr. Macielak on October 8, 2001, for right paracervical, trapezial and interscapular pain. (R. 291).  After examination, Dr. Macielak diagnosed Proctor with herniated nucleus pulposis ("HNP") at C4-5 and C5-6, and chronic cervical shoulder girdle myofascial syndrome. (R. 292).  Dr. Macielak recommended traction, as well as continued physical therapy, including isometric strengthening and range of motion. (Id.).

Proctor next saw Dr. Macielak on November 19, 2001, at which time Dr. Macielak noted that physical therapy and traction provided only temporary relief for Proctor's pain, and that Proctor was using prescription medications Vioxx and Flexeril. (R. 290).  Dr. Macielak opined that Proctor's symptoms were "secondary to his disc," and that he had been experiencing such symptoms for a year.  Dr. Macielak noted that, if physical therapy wasn't working, Proctor should consider either epidural injections or surgical intervention. (Id.).

Proctor returned to Dr. Macielak on January 22, 2002, at which time he reported cervical pain with radiation in his right upper extremity, and mid thoracic, right scapular, and periscapular pain. (R. 288).  Dr. Macielak noted that Proctor's activities were minimal, and that he hadn't worked since November 2000. (Id.).  Upon examination, Dr. Macielak noted tenderness in Proctor's right trapezium and right shoulder area, with increased muscle spasm. (Id.).  After discussion about obtaining a second opinion, Dr. Macielak scheduled an appointment for Proctor to see Richard Pratt, M.D., for consideration of epidural injections and/or surgical intervention. (Id.).

Proctor saw Dr. Pratt initially on January 30, 2002, and returned the next day to discuss his imaging studies. (R. 337-341).  Dr. Pratt reported that Proctor's self-reported symptoms did not "correlate well with" the laboratory results, and he informed Proctor that surgical intervention on the cervical spine would not be helpful, because he did not believe that the cervical spine was the specific cause of Proctor's problems. (R. 337).

On February 21, 2002, Proctor saw Dr. Rezek, complaining of significant neck pain. (R. 383).  Dr. Rezek noted that Proctor was taking Flexeril to help him sleep at night, and Vicodin and Ultram for pain relief during the day.  Upon examination, Dr. Rezek noted that Proctor's

5

gait and finger coordination were normal, but that he had significant decreased range of motion of the neck with some tenderness. (Id.).  Dr. Rezek recommended that Proctor begin taking Flexeril on a regular basis, and told him to call Dr. Pratt for a follow up visit.

Proctor returned to Dr. Pratt on March 20, 2002, for clarification of Dr. Pratt's diagnosis. (R. 335).  Examination revealed a normal gait, good power in the upper and lower extremities, and no atrophy or involuntary movements. (Id.).  Dr. Pratt assessed Proctor with "cervical pain," advised him that surgery would not be offered, and opined that further diagnostic evaluation would be appropriate. (Id.).

Proctor next saw Dr. Macielak on May 21, 2002, at which time he reported that he had been doing "not too bad," although he did have a flare-up of pain the day before in the right trapezial region at the base of his neck. (R. 390).  Dr. Macielak noted that Proctor's activities were limited, and that Proctor tried fishing, but had difficulty casting due to his arm symptoms. (Id.).  Dr. Macielak referred Proctor for an EMG/Nerve Conduction study to rule out radiculopathy.  The study was subsequently performed on June 10, 2002, and revealed "no electrodiagnostic evidence of a right cervical radiculopathy, plexopathy, neuropathy, or myopathy." (R. 389).  It was noted, however, that Proctor exhibited a tender trigger point on examination, and it was, thus, opined that "myofascial pain could be a significant part of his pain symptomatology."  As a result, it was noted that trigger point injections may be helpful. (R. 389).

On July 18, 2002, Proctor returned to Dr. Rezek, at which time examination revealed "good range of motion of the neck without significant tenderness." (R. 381).  Proctor was then seen by Dr. Macielak on August 22, 2002, at which time he stated he was "OK." (R. 388). Proctor reported that, on August 10, 2002, he had an episode of severe cervical pain with numbness in his upper extremities. (Id.).  He also reported a popping sensation and pain in and around his right shoulder area.  Upon physical examination, it was noted that Proctor was very tender with increased spasm in his right trapezium. (Id.).  Dr. Macielak indicated that Proctor could continue to control his pain with medications or begin trigger point injections.

Proctor was next seen by Dr. Rezek on September 19, 2002, at which time an examination was essentially unremarkable. (R. 380). Proctor then followed-up with Dr. Macielak on November 11, 2002, reporting that his condition had taken a significant downturn approximately 4-5 weeks earlier, when he developed severe pain his right shoulder area while sewing a seat cover for his truck. (R. 387). He went to the emergency room, received a shot of Toradol, and had x-rays, which showed "nothing wrong." (Id.). On physical examination, a prominence to Proctor's right AC joint was noted, as well as tenderness to palpation over the area. Dr. Macielak assessed Proctor with inflammation of the right AC joint, for which he indicated Proctor was a candidate for a corticosteroid injection. (Id.). After discussion of his options, Proctor indicated that he would like to try physical therapy first, before undergoing injections. (Id.).

On January 16, 2003, Proctor saw Dr. Rezek, at which time he reported "feeling okay except for his headaches." (R. 379). Examination revealed a normal gait, normal muscle strength, tone and bulk, and a fair range of motion in the neck. (Id.). On March 20, 2003, Proctor saw Dr. Macielak and reported that he was "continuing to do poorly." (R. 386). In particular, Proctor reported suffering "flash headaches," which were quite sharp and intense, and that pain was radiating toward the right shoulder and into the right elbow. Proctor indicated further that the pain increased in proportion to the amount of activity, and that driving increased his shoulder girdle pain. (Id.). Proctor also reported that, on March 14, 2003, he began experiencing lumbosacral pain with radiation into his right hip/buttock area and his posterior lateral thigh toward the knee. (Id.). After physical examination, Dr. Macielak opined that Proctor's lumbar hip complaint was myofascial and should get better. (Id.).

On April 17, 2003, Proctor returned to Dr. Rezek, reporting discomfort in his hip and upper leg. (R. 378). After examination, Dr. Rezek opined that the discomfort was "most likely local and possibly arthritic," noting that there were no reflex changes. (Id.). Proctor next saw Dr. Macielak on May 15, 2003, reporting that he was "in a lot of pain." (R. 385). Specifically, Proctor stated that he was getting sharp, stabbing pains at the tip of his right scapulae after sitting for any length of time. (Id.). Proctor also indicated that he was still experiencing

7

lumbosacral pain radiating into his right hip, buttock, and lower extremity, which got worse after walking, and that both lower extremities went numb when he laid down. (Id.). X-rays of the lower back were taken, which were essentially normal. As a result, Dr. Macielak referred Proctor for an MRI to rule out neurogenic causes of his low back and right hip problems. (Id.). The MRI was subsequently performed on May 29, 2003, and revealed "right paracentral disc herniation at the L4-L5 intervertebral disc space, which deforms the anterior aspect of the thecal sac just right of center and narrows the right neural foramen." (R. 398). No spinal stenosis was indicated. In addition, minimal central disc bulge at the L5-S1 and L3-L4 intervertebral spaces were noted. (Id.).

On September 11, 2003, Proctor had a follow-up visit with Dr. Rezek, during which it was noted that Proctor had occasional headaches and "some neck discomfort." (R. 548). Examination revealed normal coordination testing, normal gait, and a "fair range of motion of the neck with some limitation and tenderness." (Id.). Similar findings were reported during Proctor's next visit with Dr. Rezek on October 7, 2003. (R. 547).

On February 16, 2004, Proctor was seen by Dr. Macielak and reported that he was "not too great." (R. 535). He stated that, in early December 2003, he had some right paralumbar pain that bent him over, and had 2-3 similar episodes since that time. (Id.). He also reported having increased right shoulder pain. With regard to activities, Proctor stated that he "tinker[ed] in his garage," and was capable of lifting 25-30 pounds. (Id.). After examination, Dr. Macielak discussed Proctor's physical condition and the "value of exercise with aerobic and stretching and strengthening on a regular basis," adding "[h]e is a young man and he needs to get active." (Id.).

Proctor was seen by Dr. Rezek on May 7, 2004, and June 15, 2004, with no mention of cervical or low back problems on either occasion. (R. 545-46). Examinations on these dates revealed normal gait, normal coordination testing, and "good range of motion of the neck." (Id.).

On June 3, 2004, Dilip Kar, M.D., a state agency physician, reviewed Proctor's medical file and completed a physical residual functional capacity evaluation form, indicating that Proctor was capable of:  occasionally lifting 50 pounds, and frequently lifting 25 pounds;

standing and/or walking about 6 hours in an 8-hour workday; and unlimited pushing and/or pulling. (R. 474-481).  Dr. Kar indicated further that Proctor had no postural, manipulative, visual, communicative, or environmental limitations, except that he should never climb or be exposed to hazards due to his seizure disorder. (R. 476, 478).

Proctor was next seen by Dr. Macielak on August 9, 2004, who reported that Proctor "continue[d] to be quite symptomatic," with pain in the right shoulder area, right trapezium, right paralumbar, and right lower extremity. (R. 531).  Dr. Macielak noted that Proctor was "exquisitely tender" over the right AC joint, and that external and internal rotation produced pain in the joint. (Id.).  Dr. Macielak noted further that straight leg raising produced right sciatic notch and popliteal pain, and there was popliteal compression on the right. (Id.).  Dr. Macielak gave Proctor a right AC joint injection for his shoulder pain and referred him for epidural injections for his lumbar symptoms. (Id.).

On November 18, 2004, Proctor received his first epidural injection at the Meadville Medical Center, under the care of Anthony J. Colantonio, M.D. (R. 507, 533).  A second epidural injection was performed by Dr. Colantonio on January 5, 2005. (R. 505).  Dr. Colantonio subsequently performed a right-sided lumbar facet medial branch blockade at the lower four lumbar levels on January 19, 2005, which was tolerated well. (R. 500).

On March 14, 2005, Dr. Macielak reviewed x-rays and an MRI that were taken of Proctor's lateral lumbar spine, which revealed diminished disc signal at L4-5 and a very small ventral mass and some disc asymmetry at that level. (R. 526-27).  As a result, Dr. Macielak referred Proctor for a discogram of L4-5 to determine if there was any disc herniation. (Id.).

On March 26, 2005, at the request of Proctor's legal counsel, Dr. Rezak completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)", indicating that Proctor was capable of:  lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of two hours in an eight-hour work day; unlimited sitting; limited pushing and/or pulling with the upper extremities; occasional balancing, kneeling, crouching, crawling, and stooping, but no climbing; unlimited reaching, handling, fingering, feeling, seeing, hearing, and speaking; and limited exposure to temperature extremes, noise, vibration,

hazards, and fumes. (R. 538-41).

On May 12, 2005, Dr. Macielak also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," indicating that Proctor was capable of: occasionally lifting 10 pounds, and frequently lifting less than 10 pounds; standing and/or walking less than 2 hours in an 8-hour workday, 30-45 minutes at a time; sitting 30-45 minutes at a time, with periodic alternating between sitting and standing to relieve pain or discomfort; limited pushing and/or pulling with both his upper and lower extremities; occasionally climbing and stooping, but not balancing, kneeling, crouching, or crawling; and occasional reaching, handling, fingering, and feeling. (R. 556-558).

### D.    Disability Hearing

At the disability hearing conducted on April 19, 2005, Proctor testified that was single and had no minor children living with him. (R. 618).  He had not worked since November 2000, and was receiving public assistance. (Id.).  He testified that he was previously employed as a general laborer at a lumberyard; a machine operator at an aluminum factory; and a floor maintenance worker, scrubbing and waxing floors. (R. 618-19).  He had a driver's license and drove only when necessary, such as for doctors' appointments. (R. 619-20).  He testified that he had not had a seizure since May 2004, and was taking seizure medication. (R. 620).

Proctor testified that he experienced neck, right shoulder and right low back pain. (R. 621-22).  He indicated that walking and "reaching out and grabbing for things" increased his pain. (R. 622-23).  He stated that he regularly takes pain medication, but that it does not fully relieve his pain. (R. 623).  He testified that he could walk only a block before he had to sit down and rest, and could stand for only 10 to 15 minutes at a time. (Id.).  He stated that he could sit for about one-half hour at a time. (Id.).  He testified that he didn't bend at all at the waist, and that he could lift a five pound bag of sugar, but not a gallon of milk. (R. 624).  He stated that he was able to cook, but his girlfriend did it, and he didn't do any household chores. (R. 625).  He used to have a lot of outside interests or hobbies, but didn't anymore, and spent his days sleeping and watching television. (R. 625-26).

Proctor testified that he gets headaches about four days a week, which consist of a sharp pain behind the left eye and forehead, lasting two to three hours at a time. (R. 626-27). He takes a prescription medication, Topamax, to relieve the headache pain. (R. 628). Proctor testified that he is unable to do any physical activity when he has a headache. (R. 630). Proctor described the pain in his shoulder as a stabbing pain, "like somebody drove a knife down in my shoulder." (Id.). He testified that the shoulder pain frequently radiates down to his elbow. (R. 631). He stated that he didn't get any relief from the injections he received in his neck. (R. 631-32). Proctor testified that he had a discogram performed on his low back, which revealed that his "disc was pretty well wore out." (R. 633). The low back problems cause him to have trouble walking and standing, such that his "right leg quits working" after he walks one block. (R. 633).

After Proctor finished testifying, the ALJ called upon a vocational expert, Charles Cohen, Ph.D., to testify. (R. 637-45). The vocational expert testified that Proctor's past work as a laborer and a floor maintenance person was medium and unskilled; his work as a drill press operator was light and unskilled; and his work as a yard person was heavy and unskilled. (R. 637). The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Proctor, was limited to medium work with the following restrictions: unable to operate foot controls as an integral part of the job; unable to work on heights or around dangerous machinery; unable to engage in overhead reaching with the right arm as an integral part of the job; unable to hold any significant weight with his right arm in an extended position; unable to engage in repeated pushing or pulling against resistance with the right arm; and unable to bend at the waist to 90 degrees on a frequent basis. (R. 638). Based on these assumed characteristics, the ALJ asked if such an individual would be able to perform any of Proctor's previous jobs. The vocational expert responded that he would not. (Id.). The ALJ then asked if there were other jobs such an individual could perform at a medium level. The vocational expert responded that such an individual could be a packer, an assembler, or an inspector. (Id.). The ALJ then asked if there would be any jobs available for the same individual if he was reduced to light work activity with the same limitations. The vocational expert testified that the same types of jobs he identified at the medium level would be available at a

11

light level, only in reduced numbers. (R. 639).  The ALJ then asked the same question if the

individual was reduced to sedentary work, and the vocational expert testified that the same types

of jobs would be available, only in reduced numbers. (<u>Id</u>.).

The ALJ then asked if the sedentary jobs identified by the vocational expert would still

be available if the individual also had a sit/stand option, and the vocational expert responded

that they would. (R. 639)  Proctor's attorney then asked if the same jobs in the light and

medium categories would still be available with a sit/stand option, and the vocational expert

responded that the light jobs would still be available, but the medium jobs would not. (R. 640).

The vocational expert testified that the light jobs would require standing approximately two-

thirds of the time, but could require less. (<u>Id</u>.).  The vocational expert added that the light jobs

would require frequent lifting of ten pounds, with occasional lifting of twenty pounds, although

the lifting limit could be less if the job required more standing. (R. 641).  The light jobs would

also require frequent reaching. (R. 641).


### E.      The Administrative Law Judge's Decision

The ALJ made the following findings which are listed verbatim from his decision:

1.      The claimant meets the nondisability requirements for a period of disability and
        Disability Insurance Benefits set forth in Section 216(i) of the Social Security
        Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged
        onset of disability.

3.      The claimant's seizure disorder, disorders of back (discogenic and degenerative),
        cervical pain, headaches, and borderline intellectual functioning are considered
        "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c)
        and 416.920(c).

4.      These medically determinable impairments do not meet or medically equal one
        of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not
        totally credible for the reasons set forth in the body of the decision

6.      **The claimant retains the following residual functional capacity: the claimant
        is limited to performing work at the light exertional level.  He cannot
        perform work requiring the use of foot controls.  He cannot perform work
        involving heights or dangerous machinery.  He cannot engage in overhead
        reaching with the right arm, weight holding with the right arm extended, or**

**using the right arm for repetitive pushing/pulling against resistance. Additionally, he cannot bend at the waist to 90 degrees on a frequent basis.**

7. The claimant is unable to perform any of his past relevant work. (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferrable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Per the testimony of the vocational expert, all of the named jobs, both at the light and sedentary exertional level, can be performed with a sit/stand option.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 29-30)(emphasis in original).

The ALJ then determined that, based on the claimant's application and the record before him, Proctor was not entitled to a period of disability, Disability Insurance Benefits, and was not eligible for Supplemental Social Security payments.

## III.    STANDARDS OF REVIEW

### A.    Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. 42 U.S.C. §§ 405(g) provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Council affirms an ALJ decision, denies review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. <u>Aversa v. Secretary of Health &</u>

Human Services, 672 F.Supp. 775, 777 (D.N.J.1987); see also 20 C.F.R. §§ 404.905.  This court

has jurisdiction to review the case under §§ 405(g) because the Commissioner's decision became

final upon the Appeals Council's denial of review of the ALJ's decision.


    **B.    Standards applicable to the ALJ's decision**

    The Social Security Act provides limited judicial review of a final decision of the

Commissioner.  In reviewing the Commissioner's decision, this Court may not decide facts

anew, reweigh the evidence, or substitute this court's judgment for that of the Commissioner or,

by extension, the ALJ.  See Herron v. Shalala, 913 F.3d 329, 333 (7th Cir. 1994).  Rather, this

Court must affirm a decision if it is supported by substantial evidence and the ALJ has made no

error of law.  42 U.S.C. § 405(g);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.' "  Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting

Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).  See also Jesurum v. Sec'y of U.S.

Dep't of Health and Human Servs., 48 F.3d, 114, 117 (3d Cir. 1995);  Smith v. Califano, 637

F.2d 968, 970 (3d Cir. 1981).  Stokes contends that the ALJ's decision is not supported by

substantial evidence.

    A disability is defined under the Act as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment . . . which has

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A) (Supp. 2002); 20 C.F.R. § 404.1505(a) (2002).  A claimant is unable to engage

in substantial gainful activity when "his physical or mental impairment or impairments are of

such severity that he is not only unable to do his previous work, but cannot, considering his age,

education and work experience, engage in any other kind of substantial gainful work which

exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

    The Commissioner must perform a five-step sequential evaluation process to make

disability determinations under the regulations.  See 20 C.F.R. § 416.920.  If the claimant fails

to meet the requirements at any step in the process, the Commissioner may conclude that the

claimant is not disabled under the Act.  The ALJ must determine, in order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity.  See 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the ALJ evaluated the case under these guidelines and determined, at step five, that Proctor could perform certain light work available in the national economy. (R. 28-29). Specifically, the ALJ concluded that: (1) Proctor was not currently employed in substantial gainful activity; (2) that he had impairments that were severe; (3) that these impairments did not meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1999), and that Proctor retained the capacity to perform a significant range of light work; (4) that Proctor had a history of past relevant work as a laborer, floor maintenance person, drill press operator, and yard worker, which he was unable to perform; and (5) that his impairments did not prevent him from performing such jobs as a packer, assembler, or inspector. (R. 27-29).

Proctor has the burden of establishing that he is disabled under the Act.  See 20 C.F.R. §§ 404.1512, 416.912.  The ALJ should consider the claimant's ability to meet certain mental and physical demands of jobs when assessing his residual functional capacity.  20 C.F.R. §§ 404.1545(a), 416.945(a).  Proctor has specified errors that he claims were made by the ALJ in reaching his decision that he could perform a significant range of light work, which, in sum, challenge the ALJ's decision as being unsupported by substantial evidence of record. (See Plaintiff's Brief at pp. 10-17).  In particular, Proctor asserts that the ALJ failed to give consideration to Dr. Macielak's residual functional capacity assessment and "provide rationale with references to evidence of record in support of specific work-related limitations," and failed to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." (Plaintiff's Brief at p. 17).

15

**IV.    DISCUSSION**

The ALJ concluded that Proctor has the residual functional capacity ("RFC") to perform work that does not require exertion above the light level, and does not require:  the use of foot controls; exposure to heights or dangerous machinery; overhead reaching with the right arm; weight holding with the right arm extended; repetitive pushing/pulling against resistance with the right arm; and frequent bending at the waist to 90 degrees. (R. 27).

Proctor argues that the ALJ's RFC assessment exceeded the work-related limitations indicated by Dr. Macielak in his Medical Source Statement, dated May 12, 2005.  Thus, Proctor contends that the ALJ improperly discredited the opinion of his treating physician, which Proctor argues should have been given controlling weight.  Proctor argues further that the ALJ's RFC was not supported by the medical evidence of record.  This Court disagrees.

The ALJ's findings were consistent with the Medical Source Statement prepared by Dr. Rezek, Proctor's other primary treating physician, whose limitations were consistent with light duty work. (R. 538-41).  Although Dr. Rezek's limitations primarily took into account Proctor's headaches and seizure disorder, he was aware of the results of all of the objective tests that were taken of Proctor's lumbar and cervical spine, and his own physical/neurological examination findings were consistently normal, indicating full motor strength, good coordination and finger manipulation, normal gait, and fair to good cervical range of motion.

As the ALJ noted in his opinion, his RFC assessment was also consistent with the objective medical evidence. (R. 26-27).  In particular, a July 2001 MRI of Proctor's cervical spine found only small disc herniations, with no foraminal or spinal stenosis (R. 308, 313); x-rays of Proctor's right shoulder in May 2001 and October 2002 were normal (R. 399, 401); a June 2002 nerve conduction study found no evidence of right cervical radiculopathy (R. 389); an MRI of Proctor's lumbar spine in May 2003 revealed only minimal disc herniation and bulging (R. 409); a May 2004 x-ray of Proctor's cervical spine revealed only mild spondylosis (R. 424); and a February 2005 MRI of Proctor's lumbar spine found only mild degenerative changes, wit no evidence of spinal stenosis or foraminal encroachment (R. 526).  Such objective findings were in stark contrast to the magnitude of Proctor's subjective complaints of pain.  This was

16

apparently recognized by Dr. Pratt, when he advised Proctor that his medical history and clinical findings "did not correlate well" with the laboratory results. (R. 337). Indeed, even Dr. Macielak appears to have recognized that Proctor was able to do more physically than he was indicating, when he observed in February 2004 that "[h]e is a young man and he needs to get active." (R. 535).

With regard to Proctor's argument that the ALJ improperly rejected the more stringent limitations set forth in Dr. Macielak's Medical Source Statement, the regulations provide that an ALJ may reject a treating physician's opinion where it is: (i) not well supported by medically accepted clinical and laboratory diagnostic techniques, or (ii) inconsistent with other substantial evidence. 20 C.F.R. § 416.927(d)(2). In this case, the ALJ appropriately noted that Dr. Macielak's limitations exceeded "all of the objective clinical and diagnostic objective medical findings reported, including those in his own progress notes." (R. 26). The ALJ observed that the disparity between Dr. Macielak's opinion and the objective and clinical findings was due to his giving Proctor "every benefit of the doubt." (R. 26). However, the ALJ found that "the medical evidence ... does not fully support [Proctor's] allegations as to the frequency and severity of his symptoms." (R. 25). As a result, the ALJ properly assigned little weight to Dr. Macielak's opinion, to the extent it appeared to be based primarily on Proctor's exaggerated complaints of pain. Hackett v. Barnhart, 395 F.3d 1168, 1174 (10th Cir. 2005).

Based on the foregoing, this Court finds that the ALJ's RFC assessment was adequately supported by substantial medical evidence of record.

## V.    CONCLUSION

For the foregoing reasons, this Court concludes that the decision of the ALJ is properly supported by substantial evidence. Accordingly, it is recommended that the Plaintiff's Motion for Summary Judgment be denied and that the Defendant's Motion for Summary Judgment be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file

written objections to this report.  Any party opposing the objections shall have seven (7) days

from the date of service of objections to respond thereto.  Failure to timely file objections may

constitute a waiver of any appellate rights.


                                                    S/Susan Paradise Baxter
                                                    SUSAN PARADISE BAXTER
                                                    Chief U.S. Magistrate Judge


Dated: June 14, 2007

cc:      The Honorable Sean J. McLaughlin
         United States District Judge